**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**PAMELA JEAN EMIGH,**

      **Plaintiff,**

**v.**                                  **CIVIL ACTION NO.: 3:14-CV-36
(JUDGE GROH)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant**


**REPORT AND RECOMMENDATION**

**I.  INTRODUCTION**

On March 28, 2014, Plaintiff Pamela Jean Emigh ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On June 4, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 8; Admin. R., ECF No.9). On July 2, 2014, and August 6, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 17). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On May 31, 2011, Plaintiff protectively filed her first application under Title II of the Social Security Act for Disability Insurance Benefits ("DIB") alleging disability that began on November 15, 2010. (R. 146, 147). The claim was denied initially on September 22, 2011 (R. 82) and again upon reconsideration on October 26, 2011 (R. 90). On November 8, 2011, Plaintiff filed a written request for a hearing (R. 97). The hearing was held before United States Administrative Law Judge ("ALJ") H. Munday on November 13, 2012 with Plaintiff, represented by counsel Jan Dils, Esq., appearing and testifying by video in Parkersburg, West Virginia with ALJ Munday presiding from Charleston, West Virginia. (R. 36). Olen J. Dodd, an impartial vocational expert, also appeared and testified from Charleston. (R. 36). On December 7, 2012, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 16-29). On December 18, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 8).

## III. BACKGROUND

### A. Personal History

Plaintiff was born on December 28, 1959, and was fifty-one (51) years old at the time she filed her first social security claim. (R. 147). She divorced her first husband on April 1, 2005 and remarried on June 23, 2006. (R. 148). She has no dependent children but her twelve-year-old step-daughter resides with her and her husband on a part-time basis, about four days a week. (R. 42). She has two adult children and four grandchildren, whom she visits about once a month. (R. 42-43). She completed tenth grade but never received her high school diploma or GED. (R. 39).

Her prior work experience includes positions as a cutter at a photo plant from 1979 to 2000, as a waitress at both fast-food and dine-in restaurants from 2001 to 2011, including as a cashier at McDonald's in 2010 and a waitress/bartender for her brother's restaurant in 2011. (R. 63, 185). Plaintiff stated that she stopped working on April 10, 2011 due to her conditions. (R. 184). Plaintiff alleges disability due to anxiety, panic disorder, depression, chronic fatigue syndrome, degenerative disc disease of the cervical spine and arthritis of the spine. (R. 184).

**B.    Medical History**

**1.    Medical History Pre-Dating Alleged Onset Date of November 15, 2010**

On September 17, 1997, Plaintiff was admitted to Worthington Center for Behavioral Medicine after presenting to the Emergency Department with worsening depression and reporting inability to work, sleep and eat and weight loss. (R. 433-36). She was discharged the following day with diagnoses of major depression and anxiety disorder, rule out panic attacks, and an Axis III diagnosis of chronic fatigue syndrome (R. 435). Her global assessment of functioning (GAF) at this time was rated a forty (40). (Id.).

From February 27, 2009 to March 1, 2009, Plaintiff was hospitalized and underwent a number of tests at Camden-Clark Memorial Hospital that ultimately led to the removal of her gallbladder. (R. 245-75). During her initial consultations and eventual hospitalization, Plaintiff's physical exams were largely normal except for chest/abdominal pain. (R. 247, 249, 255). Physicians also noted Plaintiff's mental history and diagnoses as including depressive disorder, anxiety and/or panic disorder. (R. 249, 251, 254, 262).

Plaintiff presented for additional appointments in 2009 at Camden-Clark Memorial Hospital for various reasons, including: anehia, hypertension, hyperlipidemia, fatigue syndrome

(R. 276); ear pain (R. 283-87); hyperthyroidism (R. 291); syncope (R. 294, 296); chest pressure/pain (R. 301-05). Differential diagnoses included: acute myocardial infarction, anxiety, chest wall, gastritis, acute pericarditis, pneumonia, angina, hiatal hernia, near syncope, gastroesophageal reflux disease (GERD), abdominal pain, calculus of gallbladder with acute cholecysititis, depressive disorder, panic disorder without agoraphobia, tobacco use disorder. (R. 247, 249, 275, 285, 296, 304). Her primary treating physician during this time was Dr. L.R. Auvil, M.D.

On March 15, 2010, Plaintiff presented to an appointment with Dr. Auvil with an upset stomach and feeling unable to eat. (R. 381). Plaintiff was then treated at Camden-Clark Memorial Hospital for weight loss/gastritis with non-specific bowel gas pattern (R. 310, 315). On March 18, 2010, an ultrasound of Plaintiff's abdomen showed no abnormality. (R. 379). A radiology report from this same date notes multiple calcifications within the pelvis and a small to moderate amount of bowel gas. (R. 380).

On March 23, 2010, Plaintiff had a routine appointment with Dr. Auvil, M.D. and reported that she was supposed to return to work the day before but was still not feeling well, feeling very tired and not sleeping well. (R. 374). Her health risk factors included depression, anxiety, chronic fatigue and hypertension. (Id.). Plaintiff's diagnoses were depression, anxiety and chronic fatigue syndrome. (Id.). Her prescriptions included Xanax, Cymbalta and Sonata for sleep. (Id.).

From July 20 to July 23, 2010, Plaintiff was admitted to Camden-Clark Memorial Hospital with syncope and collapse; her primary diagnosis was unspecified chest pain with secondary diagnoses of syncope and collapse, degeneration of cervical intervertebral disc,

4

esophageal reflux, diaphragmatic hernia, cardiac dysrhythmia, unspecified hyperlipidemia, depressive disorder (not elsewhere classified), anxiety state (unspecified), tobacco use disorder. (R. 317).

On July 21, 2010, Plaintiff received x-rays of her cervical and thoracic spine. (R. 338). The impression was as follows: "1) There is some minor degenerative changes of the anterior margins of several of the upper thoracic vertebral bodies. There is no evidence of fracture or destructive lesion. 2) Mild scoliotic deformity of the midthoracic spine with convexity to the right six degrees in severity." (Id.). The impression of the cervical spine noted "1. Rather prominent dense arthritic changes involving the cervical spine from C3 distally with findings of degenerative disc disease at the 5-6, 6-7 levels. These findings result in rather significant encroachment and narrowing of the foramina bilaterally, most severe at the 3-4, 4-5, 5-6 levels on the right side, and to a lesser degree on the left. 2. Prominent arthritic changes of the lateral masses. 3. No evidence of acute fracture or cervical ribs." (Id.).

Also on July 21, 2010, Plaintiff underwent an exercise stress test, which was normal (R. 417) as well as a thallium scan, which was negative (R. 418).

On June 23, 2010, Plaintiff underwent an MRI of her cervical and thoracic spine due to posterior neck pain radiating into both shoulders and arms and down the thoracic spine. (R. 342-43). The impression noted: "1. Severe degenerative changes from C5 through C7, worse at C6-C7. At this level, there is moderate to severe central canal and bilateral neuroforaminal stenosis with disc height loss, endplate changes, and a large posterior disc osteophyte complex and disc bulge. No spinal cord signal abnormality or syrinx is identified. More mild changes are seen at C5-C6. 2. Normal appearance of the thoracic spine." (R. 343).

On August 27, 2010, Plaintiff had a routine appointment with Dr. Auvil, M.D. for routine care and hospital follow-up from cervical pain. (R. 373). Plaintiff's health risk factors included depression, anxiety, hypertension, chronic fatigue syndrome and cervical disc disease. (Id.). The physical examination was largely normal with good reflexes and no edema. (Id.). Plaintiff's medications included Xanax, Cymbalta, Lyrica and Lortab. (Id.). Dr. Auvil also recommended Plaintiff be referred to a neurosurgeon. (Id.). Her diagnoses included neuropathy in her left leg and arm as well as problems with her ear and neck, anxiety and hyperlipidemia. (Id.).

On August 30, 2010, Plaintiff was referred to Pars Brain and Spine Institute by Dr. Auvil but the record does not include any medical records from this visit. (R. 416).

### 2. Medical History Post-Dating Alleged Onset Date of November 15, 2010

On November 25, 2010, Plaintiff visited the emergency room of Camden-Clark Memorial Hospital reporting nausea, vomiting, diarrhea and cramping abdominal pains. (R. 346). At this time, Plaintiff was working in fast food and wanted to be off work because she was a food handler. (Id.). Her past medical history included anxiety and depression, previous cholecystectomy and appendectomy. (Id.). Her physical examination was largely normal. (Id.). Plaintiff was given IV fluids and medication, diagnosed with diarrhea and gastroenteritis and discharged. (R. 347).

On March 20, 2011, Plaintiff had a routine appointment with Dr. Auvil. (R. 368). Plaintiff's medical history included depression, anxiety, hypertension, chronic fatigue syndrome, cervical disc disease and hyperlipedemia. (Id.). Plaintiff's only complaint at the time was to change her Cymbalta prescription to something cheaper and continuing sinus symptoms. (Id.).

On May 14, 2011, Plaintiff presented to Camden-Clark Memorial Hospital with chest,

back and arm pain, at which time she was admitted for observation for the day. (R. 350). Her history included chronic pain and depression. (R. 353). She reported doing more heavy lifting in comparison to normal, which may have triggered the pain, as well as experiencing a sharp chest pain in her sleep. (Id.). Plaintiff further reported not working but taking care of her grandchildren at this time. (R. 363). Her physical examination showed chest and back tenderness across the bilateral shoulder blades as well as across the anterior chest but was otherwise normal, including full range of motion of all four extremities and appropriate mood and affect for the situation. (Id.). Plaintiff was diagnosed with chest pain with a rule out diagnosis of acute coronary syndrome, angina, arm pain muscular type, possible gastroesophageal reflux disease and hiatal hernia. (R. 354, 364). Her additional diagnoses included anxiety/stress, nicotine abuse and hyperlipidemia. (R. 364).

On July 26, 2011, Plaintiff had a routine office visit with Dr. Auvil, M.D. (R. 367). Her health risk factors included depression, anxiety, hypertension, chronic fatigue syndrome, cervical disc disease, and hyperlipidemia. (Id.). Plaintiff complained of intermittent episodes of pain in her left chest that is worse when lying flat and recent history of muscle strain. (Id.). Plaintiff's diagnoses included hypertension, anxiety, hyperlipidemia and depression, which were being treated with Xanax, Cymbalta and Lortab. (Id.).

On December 1, 2011, Plaintiff presented to the Camden-Clark Memorial Hospital Emergency Department for TMJ syndrome and received eardrops. (R. 420). No other abnormalities were noted. (Id.). Her prescriptions included Xanax and Ibuprofen. (Id.).

On December 9, 2011, Plaintiff presented to St. Joseph's Hospital Emergency Room with an earache, discharge and hearing loss. (R. 423). The physician noted a history of anxiety but

Plaintiff's physical examination revealed normal findings. (R. 422).

On May 4, 2012, Plaintiff presented to St. Joseph's Hospital with chest pain that is sharp across her chest. (R. 424-25). She had appeared the day prior for a stress test and returned due to continued chest pain that she experienced when she was "out yard saling" with her husband and had sudden onset of anterior chest wall pain. (R. 424, 426). She tried rest without relief and also laid down at home without relief so her husband called EMS. (R. 426). Plaintiff's physical examination was largely normal. (R. 428). There were nonspecific changes on her EKG but it was suggestive of angina and/or possible septal infarction as well as anxiety and depression. (R. 424). No significant changes were noted from a prior EKG and ECG. (R. 424, 432). Plaintiff was admitted to rule out myocardial infarction and to obtain the results of a stress test. (Id.). After examining Plaintiff, reviewing her history and obtaining the results of her stress test which showed overall low risk, doctors found Plaintiff to be an overall fairly low risk, she was given a prescription for nitroglycerin and sent home. (R. 425). Her diagnoses at this time were substernal chest pain with nonspecific changes on the EKG but suggestive of angina and/or possible septal infarction, anxiety state, tobacco use disorder and depressive disorder. (R. 425, 431).

### 3. Medical Reports/Opinion Evidence

#### a. Mental Status Examination by Amy Guthrie, M.A., September 29, 2011

On August 29, 2011, Amy Guthrie, M.A., a licensed psychologist, completed a Mental Status Examination. (R. 384-88). In preparing the report, Plaintiff was the main source of information (R. 384) as well as one page of an Adult Disability Report and a hand written report stating that she was prescribed hydrocodone and Xanax and had arthritis of the spine. (R. 385).

Plaintiff was observed as being cooperative with normal posture and gait. (R. 384). She

8

reported pain in her hip and leg on the left side with increased pain if she stands for an extended period of time as well as pain in her neck from looking up and down for an extended period of time. (Id.). Plaintiff's chief complaints were "I have anxiety and panic attacks. I have three deteriorated discs in my neck" with an onset ten years prior and interference with work in 2009 (R. 385).

Plaintiff described her presenting symptoms as never sleeping a whole night and sometimes waking up from not breathing; she worries before she falls asleep and her mind never shuts off; she has crying spells approximately once every couple of months and they may last up to 45 minutes; her energy is low due to chronic fatigue syndrome; her appetite comes and goes and she often has to force herself to eat; she has been losing weight and her weight tends to fluctuate; she is currently feeling stressed and depressed; is anxious all of the time and her anxiety has gotten worse over the past few years; she denied any current suicidal or homicidal ideation and has not had any past suicide attempts. (Id.). Plaintiff stated she has high anxiety when she is in a car and fears that she may have a car accident; she has high anxiety when she has to go to Wal-Mart and feels closed in by people and the need to get out of the store; she suffered a panic attack when her aunt died about two years ago; on occasion when she is alone and worrying, she will notice that her face and arm tingle, she cannot breathe, she sweats, feels shaky and her heart races for approximately fifteen to twenty minutes, afterwards she feels exhausted; she also described OCD traits related to counting and having a particular way of doing things. (Id.).

Plaintiff reported not currently receiving any mental health treatment but noted that she had received intensive outpatient treatment approximately ten years ago. (R. 386). She was

placed in this outpatient program for two to three weeks after having a twenty-four hour observation in the psychiatric unit. (Id.). Thereafter, she received counseling one or two times in Vienna, West Virginia. (Id.).

As for medical history, she was hospitalized for four days for pain in her chest and had also been admitted for panic attacks and had her gallbladder removed. (Id.). She is also diagnosed with chronic fatigue syndrome. (Id.). Her medications included Xanax, Cymbalta, hydrocodone and Flexeril. (Id.).

In regard to her work history, Plaintiff explained that she quit working at her brother's business after three months because of the high level of stress. (Id.). She also worked for McDonalds for eight to nine months in 2010 but found that she was frustrated, stayed anxious and became irritable. (Id.). She previously worked for Nashua between 1981 and 1988 in production but would often "space out" on the job, had to fix frequent mistakes, would often get into a hurry and experience problems with concentration and focus. (Id.).

The mental status examination noted Plaintiff to be adequately groomed, appropriately dressed, cooperative and oriented with an anxious mood and appropriate affect to mood. (Id.). Her thought process was generally coherent but some thought blocking was noted and she was slow to answer some questions. (R. 387). As for thought content, Plaintiff endorsed OCD traits related to counting and having a particular way of doing things as well as a phobia of traveling and heights. (Id.).  Perceptually, she reported periods of depersonalization in which she feels like she is zoning out and has tunnel vision. (Id.). Her insight was mildly deficient and psychomotor behavior mildly increased as she was noted to be fidgety. (Id.). Her judgment was within normal limits, immediate memory within normal limits but recent memory was markedly deficient and

remote memory mildly deficient. (Id.). Her concentration was mildly deficient, persistence within normal limits and pace mildly slow, as observed by completion of tasks. (Id.).

Plaintiff's social functioning was noted to be mildly deficient during the evaluation, as she presented with an anxious mood. (R. 387). The examiner noted that she provided adequate eye contact, was socially appropriate and was able to partake in reciprocal conversation. (Id.). Plaintiff reported she has contact with her daughter on almost a daily basis, she visits her aunt a couple of times a year, calls her neighbor approximately once a moth, will occasional go out to eat or shop with her husband, talks to her sister a couple of times per week and goes to her son's house every now and then. (Id.).

In describing her daily activities, Plaintiff stated that she awakes between six and nine a.m., has coffee, sometimes sits on the porch, typically sits around the house, takes her medication as prescribed, watches television, goes in and out of the house throughout the day, tries to straighten up the house, does some reading, cooks dinner if she feels like it, and usually gets in bed around ten p.m. (Id.). Plaintiff reported that she has been depressed and gone three days without showering. (Id.). She cooks, cleans and tries to help with the laundry. (Id.). She only drives if she has to and may go for a fifteen to twenty minute walk in the evening. (Id.).

Ms. Guthrie's Axis I diagnosis was Panic Disorder with Agoraphobia and Depressive Disorder, not otherwise specified; and Axis III diagnosis of chronic pain and chronic fatigue syndrome, by report. (Id.). Her diagnostic rationale for panic disorder with agoraphobia is given based on Plaintiff's report that she experiences panic attacks in which her face and arm tingle, she cannot breathe, she sweats, feels shaky and has a racing heart for approximately fifteen to twenty minutes as well as difficulty going out in public because she is concerned about having a

panic attack. (R. 388). Her diagnosis for Depressive Disorder is based on Plaintiff's report that she has difficulty sleeping throughout the night, experiences crying spells every couple of months, her low energy due to chronic fatigue syndrome, decreased appetite and weight loss as well as recent stressed and depressed mood. (Id.). Plaintiff's prognosis at this time was "guarded" and Ms. Guthrie noted that she would be capable of managing her own finances. (Id.).

### b. Psychiatric Review Technique by Frank Roman, Ed.D, September 21, 2011

On September 21, 2011, Dr. Frank Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff based on possible listings of 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. (R. 391). Under 12.04 Affective Disorders, Dr. Roman found Plaintiff experienced a disturbance of mood, as evidenced by a depressive syndrome characterized by decreased energy and feelings of guilt or worthlessness. (R. 394). Under 12.06 Anxiety-Related Disorders, Dr. Roman found anxiety as the predominant disturbance or anxiety as evidenced by generalized persistent anxiety accompanied by motor tension and apprehensive expectation; a persistent irrational fear of a specific object, activity or situation; and recurrent obsessions or compulsions which are a source of marked distress. (R. 396).

As for the "B" criteria of Listings 12.04 and 12.06, Dr. Roman found only mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 401). Dr. Roman further found that Plaintiff did not meet the "C" criteria of the listings. (R. 402).

In his notes, Dr. Roman explained that in November 2010, Plaintiff alleged anxiety, panic disorder and depression with mental health treatment in the form of medication (i.e., Xanax and

12

Celexa) from her treating practitioner. (R. 403). He also reviewed the consultative examination from September 14, 2011 in which Plaintiff was diagnosed with panic disorder with agoraphobia and depressive disorder, not otherwise specified. (Id.). Dr. Roman further found that based on the medical evidence of record, Plaintiff was credible. (Id.).

### c. Mental Residual Functional Capacity Assessment by Frank Roman, Ed.D, September 21, 2011

For Plaintiff's Mental Residual Functional Capacity Assessment, Dr. Roman considered categories for 12.04 and 12.06 Listings. (R. 406). Dr. Roman found Plaintiff was not significantly limited in her understanding and memory. (Id.). Under sustained concentration and persistence, Plaintiff was found to be not significant limited in five of the eight areas but found to be moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; and to work in coordination with or proximity to others without being distracted by them. (R. 406-07). For social interaction, Plaintiff was not significantly limited in three of the five categories and was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 407). For adaptation, Plaintiff was not significantly limited in any of the four areas. (Id.).

As for the functional capacity assessment, Dr. Roman notes that Plaintiff's Mental RFC only reveals moderate deficits and that the deficits do not meet or equal a listing. (R. 408). Dr. Roman commented that Plaintiff worked at a photo plant as a cutter for twenty-one years until 2000, then worked briefly as a waitress and quit in April 2011 due to stress. (Id.). She also reported degenerative disc disease in her neck as well as depression and panic attacks. (Id.). Dr. Roman noted that she "remains independent in her activities of daily living ("ADLS") and is able

to drive to appointments as necessary but will avoid large social setting." (Id.). Dr. Roman then concluded "[b]ased on MER, she is able to follow routine entry level work in a task oriented setting. She can tolerant [sic] minor change in routine and adapt to her work environment. She can tolerate only minimal social interaction. She remains cognitively capable of SGA work with the above considerations." (Id.).

On October 14, 2011, Dr. Karl G. Hursey, with a specialty in psychology, reviewed the medical evidence of record and this above decision and affirmed as written. (R. 412).

### d. Physical Residual Functional Capacity Assessment by Judy Schroeder, September 21, 2011

On September 21, 2011, Judy Schroeder, a single decision-maker, completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. 74-81). For exertional limitations, Plaintiff was limited to occasionally lifting/carrying twenty pounds; frequently lifting/carrying ten pounds; standing/walking for about six hours in an eight hour work day; sitting for about six hours; and unlimited pushing and pulling. (R. 75). For postural limitations, Plaintiff was found to be able to occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl but never climb ladders, ropes and scaffolds. (R. 76). Ms. Schroeder assessed no manipulative or visual limitations. (R. 77). She did not note whether or not Plaintiff had any communicative limitations in hearing or speaking. (R. 78). As for environmental limitations, Plaintiff should avoid concentrated exposure to extreme cold and hazards, such as machinery and heights, but may have unlimited exposure to other environmental limitations. (R. 78). Regarding severity of Plaintiff's symptoms, Ms. Schroeder noted, "the claimant's reports of pain, limitations appear to be mostly credible, however she is able to engage in most normal day activities." (R. 79).

In preparing the assessment, Ms. Schroeder noted that there were no medical source

statements in the record. (R. 80). Ms. Schroeder also referenced medical records indicating a normal physical exam in 2010, admittance to the hospital for chest pain in May 2011, a psych consultative examination that found her posture and gait were normal, prescription medications including hyrdocodone, Lyrica and Flexeril for pain and a July 2011 appointment for depression, anxiety. (R. 81).

This Physical RFC was reviewed on October 14, 2011 by Dr. A. Rafeal Gomez, M.D., an internal medicine specialist, and was affirmed as written. (R. 410).

**C.    Testimonial Evidence**

At the ALJ hearing held on November 13, 2012, Plaintiff testified regarding her personal life and finances. Her current source of income is her husband, who works as water technician at the power plants. (R. 44). She does not receive food stamps or other assistance. (R. 44-45). She completed tenth grade and has trouble with writing, spelling and some math. (R. 44).

As for her work experience, Plaintiff testified that she worked at McDonald's as a cashier for about six months in 2010, but left due to the constant standing, bending down, looking up and increasing stress and panic attacks. (R. 45-46). In the beginning of 2011, she worked at her brother's restaurant/bar for about four months where she helped with various tasks, including cleaning, cooking and bartending. (R. 46). She quit this position because she started not feeling well; she was feeling tired all the time, experiencing neck and leg pain, and struggling being around a crowd. (R. 47). Prior to these positions, she worked as a cutter at a photo plant but stopped working there in 2000 when the business closed. (R. 48). However, Plaintiff had missed about five months of work due to anxiety and depression prior to the business's closure. (Id.).

Plaintiff further testified regarding her mental impairments. She explained that she "can't

deal with a lot of people" and gets "frustrated really easy," which then causes her to have a panic attack. (R. 48). In describing her panic attacks, Plaintiff explained that she starts sweating and feels as if she is having a heart attack and "I just have to get out of there." (Id.). The panic attacks typically occur when she is around a crowd of twenty or more people and are compounded when the crowd is loud or there is confusion. (R. 49). Plaintiff further explained that her fatigue is brought out by not resting properly due to stress. (Id.). She is unable to sleep, eat or leave the house. (Id.). She stated that her stress is caused by constantly worrying about her children, having to drive to go somewhere and "simple everyday things." (Id.). Plaintiff further explained that her difficulty sleeping may flare up for a month or even up to five months. (R. 50).

In regard to her physical impairments, Plaintiff testified that she experiences pain from the base of her head down to the shoulders and sometimes into her left arm and down her leg. (Id.). Plaintiff stated that "sometimes I get up in the mornings, and it'll hurt to the point to where I'm sick. And it'll hurt all day, even though I take my pain medicine. (Id.). Plaintiff stated that the pain in her left leg will last for about a month or two, then not hurt for a week and then return, but the pain in her arm is usually every day. (R. 50-51). Her neck pain increases when she constantly holds her neck a certain way or sleeps a certain way. (R. 51). She cannot look up or bend her neck down for longer than ten or twenty minutes without pain. (R. 51-52). She classified the pain in her neck after looking down for a period of time at about a seven out of ten. (R. 52). Plaintiff explained that she has aching pain every day, which gets worse if she is standing or holding a particular position, and the pain gets worst throughout the day. (Id.). As for her pain medication, Plaintiff stated "[i]t helps. Yeah, it makes me sleepy. I don't like that. But it does help." (Id.). Plaintiff explained that even with the pain medication she still experiences an

"irritating" or "burning-type pain" but it is not "that constant pain" she experiences without medication. (R. 53). In order to alleviate her neck pain, Plaintiff testified that she situates herself on the couch with pillows and a heating pad, then takes her medicine and waits for the pain to stop. (R. 53-54). She typically lies down with pillows in an attempt to alleviate her neck pain at least twice a day, especially when she first wakes up in the morning (R. 54). As for back pain, Plaintiff testified that she only experiences lower back pain once in a while depending on her activities; for example after trying to shampoo the carpet, which she does at least twice a year, Plaintiff's back will hurt for a couple of days after the activity. (R. 53).

At the hearing, Plaintiff also testified regarding her mental impairments. Plaintiff explained that she no longer sees a mental health counselor routinely but she previously engaged in two-week daily outpatient therapy, followed by several months of therapy. (R. 55). She stated that after her therapist got her medication adjusted she no longer went to see the therapist. (Id.). She also occasionally has appointments with Dr. Sams, who adjusts her medications. (R. 56).

Plaintiff also testified regarding her daily activities. Plaintiff stated that she wakes up, gets her step-daughter up and ready for school if she is there, spends a couple of hours sitting or lying on the couch, maybe washes a few dishes and watches television. (R. 56). As for household chores, she will do some dusting but she does not vacuum very often and her husband does most of the laundry and heavier cleaning. (Id.). She reads books every once in a while but loses interest easily. (R. 57). As for social functions, she visits her grandchildren about once a month and usually sits and watches them play. (R. 43). She drives a couple times a week, mainly to pick up her stepdaughter five minutes down the road and to go grocery shopping, about once every two weeks. (Id.). She visits family a couple times a year and has a friend that will come to see

her once a week or so and they will occasionally run into town to get something to eat. (R. 57).

In regard to her abilities, Plaintiff testified that she could walk for about ten minutes before needing to rest. (R. 57). As for lifting, she said her grandson is about twenty pounds and after lifting him she can feel pain instantly in her leg and neck. (R. 58). She stated she could sit for about half an hour before needing to get up and could stand no more than a half an hour or an hour without her leg hurting. (Id.).

## D.    Vocational Evidence

Also testifying at the hearing was Olen J. Dodd, a vocational expert. (R. 61). Mr. Dodd characterized Plaintiff's past work as a waitress at a sit down restaurant, with some bartending, as a semi-skilled occupation in the light range of exertional demands; her work as a fast food worker as unskilled and light exertion; and a photo plant cutter as unskilled and light. (R. 63-64). In regard to Plaintiff's ability to return to her prior work, Mr. Dodd gave the following responses to the ALJ's first hypothetical:

> Q:    I'd like for you to assume a hypothetical individual of the claimant's age, education, and the past jobs you just described. Further assume that the individual is limited to light work, can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Never climb ladders, ropes, or scaffolds, occasional exposure to extreme cold. Able to perform simple routine tasks involving no more than simple short instructions, and simple work-related decisions with few workplace changes. Occasional interaction with the general public, no more than 20 people at a time, and occasional interaction with co-workers. Based on that hypothetical, can the individual perform any of the past jobs you described?
>
> A:    The only one that fully qualifies under all your of [sic] hypothetical would be the cutter for the photo finishing would fall within those parameters. The elimination of the waitress, and the fast food worker is because it's frequent public, even though you clarified the job is no more than 20 people as far as the occasional public – you may or may not run into that situation, depending on the size of the facility – of the restaurant.
>
> Q:    Okay.

A:    So I'm going to eliminate that on the safe side, because it does require usually frequent contact with people.

Q:    Okay.

A:    Yeah.

Q:    Because the cutter job, are there other jobs that you can name, and if so, could you give a few examples?

A:    Yes. Examples at the light physical demand level would include a sorter…a floor worker…garment inspector…

(R. 64-65). Incorporating the above hypothetical, the ALJ then questioned Mr. Dodd regarding

Plaintiff's ability to perform light work based on additional limitations in a second hypothetical:

Q:    If I were to add to that hypothetical that the individual requires one to two breaks, no more than 15 minutes, to lie down and put pillows under her neck. How does that change your job – or your answer, if at all?

A:    The normal – if that can be done during the normal work breaks, of a morning break for 15 minutes, and afternoon break for 15 minutes, and a lunch break – or during the lunch break, they could still perform the jobs identified. But additional breaks beyond that would not be consistent with how the job is normally performed.

(R. 65-66). The ALJ made further additions for his third hypothetical:

Q:    If I were to add to the last hypothetical that the individual is unable to work in close proximity to others, how does that change your answer, if at all?

A:    There is – the job as a garment inspector and sorter is primarily done independently, so it's not with other co-workers. So those would qualify. The job as a floor worker does have occasional contact with co-workers, so if we're eliminating all close proximity to them, there is some coordinated effort with co-workers in that job, but it's only occasionally.

Q:    And can you name a third job in addition to the garment inspector and sorter?

A:    Yes. A cleaner…

(R. 66). The ALJ then made additional limitations for the fourth hypothetical posed to the

vocational expert:

> Q: If due to chronic fatigue, the hypothetical individual is going to have unplanned absences of a minimum of four per month, how does that change your answer, if at all?

> A: I believe that would be too excessive of an absenteeism rate to be able to keep a job.

(R. 66-67). Finally, Plaintiff's attorney questioned Mr. Dodd regarding limitations based on Plaintiff's neck pain resulting in a decreased range of motion of the cervical spine:

> Q: After looking down or looking up for 10 to 15 minutes, she'd need to take a break for five to 10 minutes and be able to look straight ahead, as opposed to down.

> A: The jobs I identified basically don't require any flexion or extension of the cervical spine, or bending of the neck that can be done with peripheral vision, or movement of the eyes. So as long as the individual has adequate eye movement and visual acuity, then that would not be a problem to perform these jobs.

(R. 69-70). Mr. Dodd then stated that his testimony had been consistent with the Dictionary of Occupational Titles. (R. 70).

## E.    Report of Contact Forms

A report of contact form by Judy Schroeder dated September 21, 2011 states that Plaintiff is limited to light exertional work with both physical and mental restrictions. (R. 198). Ms. Schroeder noted that "a finding about the capacity for PRW ("past relevant work") has not been made. However, this information is not material because all potentially applicable medical-vocational guidelines would direct a finding of 'not disabled,' given the claimant's age, education, and RFC. Therefore, the claimant can adjust to other work." (Id.).

On October 25, 2011, a report of contact form was completed by Lorraine B. Wilson. (R. 214). Ms. Wilson found that Plaintiff is limited to light exertional work with postural restrictions and mental limitations to one and two steps and mental restrictions to avoid crowds. (Id.). Ms.

Wilson did not make a finding as to Plaintiff's ability to perform past work but did find that claimant can perform other work in the national economy, including a silver wrapper, stamp pad finisher and floor worker. (Id.). Ms. Wilson noted: "[a] finding about the capacity for PRW has not been made. However, this information is not material because all potentially applicable medical-vocational guidelines would direct a finding of 'not disabled,' given the claimant's age, education and RFC. Therefore, the claimant can adjust to other work." (Id.).

**F.    Lifestyle Evidence**

On an adult function report dated June 22, 2011, Plaintiff stated that due to the three deteriorated discs in her neck she experiences pain in her arms everyday, she cannot lift a lot or bend her neck down for a very long time. (R. 190). Due to her chronic fatigue, she feels tired all of the time. (Id.). Because of her anxiety, she is afraid to leave the house and experience severe panic attacks; this anxiety as well as physical conditions contributes to her depression. (Id.). As for her typical day, Plaintiff stated that she wakes up, takes her pain medication, works on the house a little at a time, takes an hour nap, sits on the porch, sometimes take a small walk and usually fixes a small dinner. (R. 191). As for sleep, Plaintiff explains that there are nights when her neck pain keeps her awake or she will wake up with something on her mind and then be unable to go back to sleep. (Id.).

Plaintiff reported no problems with her personal care but occasionally needs reminders to bathe if she is experiencing a bad depression. (R. 191-92). As for meals, Plaintiff stated she prepares her own meals daily, which mainly include sandwiches or frozen dinners but she rarely cooks meals due to her neck pain and loss of interest in cooking. (R. 192). With regard to household chores, Plaintiff stated she does laundry and cleaning about two times a week and

needs help with dishes, sweeping and any lifting but that "most of the day I can't do it all with pain medicine and taking a break." (Id.). Plaintiff stated that she does not do yard work because of her neck and shoulder pain but she does go outside about two times a day. (R. 193).

Plaintiff stated that she is able to drive and ride in a car but if she is going through anxiety or depression at the time, she will have a panic attack if she drives. (R. 193). In regard to shopping, Plaintiff is able to shop in stores for food about once a week. (Id.). She is able to manage her own money but when she is in pain and depressed she often does not take care of things that she should. (R. 194). Her hobbies and interest include watching television for about an hour a day and reading for about thirty minutes a day, which is limited due to trouble concentrating and staying interested. (Id.).

In regard to social activities, Plaintiff talks to her daughter every day and she will visit a couple times a week and they sometimes take a short walk. (R. 194). Plaintiff does not belong to any social groups or organizations. (Id.). She does not like to go far from home and if her anxiety is bad that day she will not want to leave the house by herself. (Id.). Plaintiff explained that whether she leaves the house depends on her mood and pain. (R. 195).

As for her abilities, Plaintiff noted that her conditions affect her ability to lift, bend, stand and concentrate. (R. 195). She explained that she cannot lift anything heavy, that standing or bending over causes neck, arm and leg pain, and that she cannot concentrate for very long or her mind starts to wander. (Id.). She stated she can only pay attention for about thirty minutes, she has trouble finishing what she starts, she has difficulty following written instructions and often has to double check herself, she does not follow spoken instructions very well and has trouble understanding. (Id.). Plaintiff gets along well with authority figures and has never been fired or

laid off. (R. 196). Plaintiff stated that she does not handle stress well, which is why she takes Xanax and Celexia every day, and she does not handle changes in routine well in part due to difficulty learning new things. (R. 196).

On October 12, 2011, Plaintiff completed a Disability Report with the SSA office and reported that she is "always so tired and never feel[s] motivated to do anything. I need a little push to get going in the day, getting dressed does cause pain because of my deteriorating discs." (R. 203). Plaintiff stated that she does not drive much because of her anxiety and does not go out in public alone. (Id.).

In a subsequent Disability Report form, Plaintiff stated that she has been experiencing an increase in arthritis pain and feeling more depressed and anxious since October 1, 2011. (R. 217). Plaintiff explained that "most days I am too depressed to get out of bed and complete personal tasks." (Id.). She stated, "I do not leave the house for any reason." (Id.).

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

23

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.**

2. **The claimant has not engaged in substantial gainful activity since November 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq*.).**

3. **The claimant has the following severe impairments: cervical disc disease and spinal stenosis with neck pain; chronic fatigue syndrome; depressive disorder, not otherwise specified (NOS); and panic disorder with agoraphobia (20 CFR 404.1520(c)).**

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant can tolerate no more than occasional exposure to extreme cold. Additionally, the claimant is capable of performing simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes. She can tolerate occasional interaction with the general public as well as co-workers. The claimant requires up to two breaks, no more than 15 minutes, to lie down with pillows, in order to alleviate her symptoms of neck pain. She is unable to work in close proximity to others secondary to being easily distracted.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on December 28, 1959, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1559 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2010, through the date of this decision (20 CFR 404.1520(g)).

(R. 21-28).

# VI.  DISCUSSION

## A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.  1987).

## B.    Contention of the Parties

Plaintiff, in her motion for summary judgment, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence when the record as a whole is

reviewed by the court." (Pl.'s Mot. at 1, ECF No. 13). Specifically, Plaintiff alleges two issues

on review:

- Whether the ALJ's findings at steps four and five of the sequential process are supported
  by substantial evidence.

- Whether the ALJ properly evaluated Plaintiff's credibility.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 2, ECF No. 14). Plaintiff asks the Court

to remand the case "as it is not supported by substantial evidence." Id. at 11.

Defendant, in her motion for summary judgment, asserts that the decision is "supported

by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No.

17). Specifically, Defendant alleges that:

- The ALJ appropriately found that Plaintiff was unable to perform her past relevant work
  and that she was not disabled at Step Five of the sequential evaluation process.

- The AJL properly assessed Plaintiff's allegations and substantial evidence supports the
  ALJ's credibility finding.

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 8, 10, ECF No. 18).

**C. Discussion of the Administrative Law Judge's Decision**

**1. Whether the ALJ's Erred in her Step Four Finding that Plaintiff Was Unable to Perform Past Relevant Work and Step Five Finding that Plaintiff is Able to Perform Other Work in the Regional or National Economy**

At the fourth step of the sequential evaluation process, the ALJ assesses the claimant's

residual functional capacity and considers the "physical and mental demands of your past

relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 1520(e), 1520(f). If the ALJ finds at this stage

that the claimant is able to do her past relevant work, the claimant is not disabled. Id. If the

claimant's impairments prevent her from performing her past relevant work, then the ALJ proceeds to the fifth and final step. At the fifth step, the ALJ considers the "assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work." 20 C.F.R. §§ 404.1520(a)(4)(v), 1520(e). "If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled." Id.

Plaintiff argues that the ALJ erred at step four by stating that Plaintiff was unable to perform her past relevant work as a cutter/photo finisher at the unskilled light exertional level due to "significant symptoms and limitations." (Pl.'s Br. at 8). Plaintiff asserts that this finding "was contrary to the testimony of the vocational expert who specifically stated the plaintiff could return to her work as a cutter/photo finisher." (Id.). Plaintiff also argues that the ALJ erred by rejecting the VE's "testimony as to the plaintiff's ability to perform her past relevant work" but then adopting the VE's "testimony that the plaintiff could perform other work at the unskilled light level" at step five. (Id. at 8-9). Moreover, according to Plaintiff, the ALJ erred by not identifying the "significant symptoms and limitations" she took into consideration when making her step four determination given that the VE testified Plaintiff could perform her past work and other work for the ALJ's adopted RFC. (Id. at 9).

Defendant argues that the ALJ, "giving Plaintiff the benefit of the doubt, found at step four that Plaintiff was unable to perform her past relevant work." (Def.'s Br. at 8). Defendant argues that it is Plaintiff's burden at step four to prove inability to perform her previous work and that agency regulations do not require an ALJ to use the services of a VE to obtain evidence at step four of the sequential evaluation process. (Id. at 9). Additionally, Defendant argues that

Plaintiff failed to show a harmful error occurred because a finding that Plaintiff could perform her past relevant work would mean that Plaintiff would be found not disabled. (Id. at 8-9). Defendant further argues that substantial evidence supports the ALJ's step five finding that Plaintiff could make an adjustment to other work given her RFC and her age, education and work experience. (Id. at 9).

When reviewing the hearing transcript, the ALJ presented a total of four hypotheticals to the vocational expert. The first hypothetical described the light exertional level with postural, environmental and communicative limitations:

> the individual is limited to light work, can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Never climb ladders, ropes, or scaffolds, occasional exposure to extreme cold. Able to perform simple routine tasks involving no more than simple short instructions, and simple work-related decisions with few workplace changes. Occasional interaction with the general public, no more than 20 people at a time, and occasional interaction with co-workers.

(R. 64). In response to this hypothetical, the vocational expert confirmed that Plaintiff's past relevant work as a "cutter for photo finishing would fall within those parameters" but eliminated Plaintiff's prior work as a waitress and fast food worker due to frequent interaction with the public. (Id.). The vocational expert also stated that based on the first hypothetical, the individual could also work as a sorter, a floor worker and a garment inspector. (Id.).

Next, the ALJ presented a second hypothetical to the vocational expert, which included the additional limitation "that the individual requires one to two breaks, no more than 15 minutes, to lie down and put pillows under her neck." (R. 65). The vocational expert responded that if the breaks to lie down could be done "during the normal work breaks" than the individual "could still perform the jobs identified," which were Plaintiff's past relevant work as a cutter/photo finisher, as well as jobs as a sorter, a floor worker and a garment inspector. (R. 65).

Then, the ALJ presented a third hypothetical, which added "that the individual is unable to work in close proximity to others." (R. 65). In response, the vocational expert explained that with that additional limitation the individual could still perform work as the garment inspector and sorter because they are primarily done independently, but he specifically eliminated the floor worker because that position has occasional contact with co-workers. (Id.). The vocational expert also added the position of a cleaner when asked to name a third job. (Id.). At this time, the vocational expert did not specifically include Plaintiff's past relevant work as a photo cutter, nor did the vocational expert specifically exclude the position. (Id.).

Lastly, the ALJ presented a fourth hypothetical with the added limitation of having "unplanned absences of a minimum of four per month." (R. 65). In response to this hypothetical, the vocational expert stated that an individual with that added limitation would not be able to keep a job due to excessive absenteeism. (Id.).

When formulating the RFC, the ALJ adopted the limitations contained in the first three hypotheticals presented to the vocational expert. (R. 24). Specifically, the ALJ found:

> [*First hypothetical*]: that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant can tolerate no more than occasional exposure to extreme cold. Additionally, the claimant is capable of performing simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes. She can tolerate occasional interaction with the general public as well as co-workers. [*Second hypothetical addition*]*:* The claimant requires up to two breaks, no more than 15 minutes, to lie down with pillows, in order to alleviate her symptoms of neck pain. [*Third hypothetical addition*]: She is unable to work in close proximity to others secondary to being easily distracted.

(R. 24) (emphasis added to demonstrate that the three hypotheticals presented to the vocational expert were integrated in the ALJ's adopted RFC assessment). According to this RFC, which

was presented in its entirety after the third hypothetical, the vocational expert found, and the ALJ agreed, that Plaintiff could perform work as a garment inspector, sorter and cleaner. (R. 65; R. 28).When presented with the third hypothetical, the vocational expert did not specifically exclude, nor include, Plaintiff's past relevant work as a photo cutter.

In the ALJ's decision at step four, the ALJ's complete finding was as follows:

> The claimant has past relevant work as a cutter/photo finisher. The vocational expert testified that the claimant's past work was unskilled work performed at the light exertional level. Although not specifically excluded by the vocational expert, the undersigned has determined that the claimant's significant symptoms and limitations make her unable to perform this past relevant work. Accordingly the claimant is unable to perform past relevant work as a cutter/photo finisher.

(R. 27). While Plaintiff argues that this finding is contrary to the testimony of the vocational expert, the undersigned does not agree. (Pl.'s Br. at 8). The vocational expert specifically testified that Plaintiff could perform her past relevant work as a cutter/photo finisher based on the first and second hypotheticals. (R. 64-65). The ALJ then presented additional limitations with the third hypothetical (*i.e.*, the inability to work in close proximity to others), which was adopted in the ALJ's ultimate RFC determination. (R. 65). In response to this third hypothetical, contrary to Plaintiff's assertions, the vocational expert did not "specifically state" that Plaintiff *could* return to her past work as a cutter/photo finisher. (R. 65; Pl's Br. at 8). Instead, the vocational expert named three jobs that Plaintiff could perform: a sorter, a garment inspector and a cleaner, while not mentioning the job as cutter/photo finisher at all. (R. 65). Contrary to Plaintiff's allegations, the undersigned does not find the vocational expert's silence as to the cutter/photo finisher position in response to this third hypothetical to mean he affirmatively found that Plaintiff could perform her past work as a cutter/photo finisher.

Pursuant to 20 C.F.R. § 404.1520(e), the ALJ uses the "residual functional capacity

assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work." In the present case, despite Plaintiff's assertions, there is no indication that the ALJ failed to use Plaintiff's RFC at step four of the sequential evaluation process in determining that Plaintiff could not perform her past relevant work. The ALJ found that "the claimant's significant symptoms and limitations make her unable to perform this past relevant work." (R. 27). While Plaintiff argues this means the ALJ adopted additional "significant symptoms and limitations" beyond the adopted RFC, the undersigned is not so persuaded. The vocational expert classified Plaintiff's past work as unskilled and light in exertion. (R. 64). The ALJ's RFC limited Plaintiff to light exertional work with a number of postural, environmental and communicative limitations based on Plaintiff's physical and mental symptoms. (R. 24). It is these "significant symptoms and limitations," presented in the hypotheticals to the vocational expert, that were ultimately adopted and incorporated into Plaintiff's residual functional capacity. While Plaintiff attempts to infuse additional meaning into the ALJ's phrase "significant symptoms and limitations," the undersigned is not persuaded and sees no evidence that the ALJ considered any additional symptoms or limitations not already incorporated in the ALJ's comprehensive and limited RFC. Accordingly, the undersigned does not find that the ALJ erred in making the step four determination that Plaintiff count not perform her past relevant work.

Additionally, the ALJ acknowledges in the decision that the cutter/photo finisher position was not "specifically excluded by the vocational expert." (R. 27). However, a vocational expert's testimony at step four is not binding on the ALJ nor even required by the Social Security regulations or rulings. In making a step four determination, the regulations specify that the ALJ "*may* use the services of vocational experts or vocational specialists, or other resources, such as

the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity." 20 C.F.R. § 404.1560(b)(2) (emphasis added). Accordingly, the ALJ is not bound by the vocational expert's testimony but *may* use such testimony to help make the ultimate determination at step four. Here, the ALJ considered the vocational expert's testimony, Plaintiff's residual functional capacity and her past relevant work as a cutter/photo finisher to make the ultimate determination that Plaintiff could not perform her past relevant work. The vocational expert's silence as to the cutter/photo finisher position in response to the third hypothetical does not negate the ALJ's ultimate decision that Plaintiff could not return to her previous work in the position.

Plaintiff points to SSR 82-62 in support of her argument that the ALJ erred at step four by arguing that the ALJ failed to provide a clear explanation and sufficient documentation supporting her decision. (Pl.'s Br. at 9). Social Security Ruling 82-62 explains the "procedures for determining a disability claimant's capacity to do past relevant work." SSR 82-62, at *1. The ruling explains that the ALJ is to first evaluate what the Plaintiff can do physically and mentally through the RFC assessment. SSR 82-62, at *2 (stating that evaluation under § 404.1520(e) "requires careful consideration of the interaction of the limiting effects of the person's impairment(s) and the physical and mental demands of his or her PRW to determine whether the individual can still do that work."). Then the claimant's residual functional capacity is compared with the physical and mental demands of the claimant's past relevant work. Id. at *3. The ruling further explains the importance of developing a full explanation and necessary documentation to support an ALJ's determination at step four:

The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).

SSR 82-62, at *3. The ruling further states that "[a] decision that an individual is not disabled, if based on sections 404.1520(e) and 416.920(e) of the regulations, must contain adequate rationale and findings dealing with all of the first four steps in the sequential evaluation process." SSR 82-62, at *4. Here, Plaintiff argues the ALJ's decision fails to meet the requirements of SSR 82-62 because the ALJ did not specify the additional "symptoms and limitations" considered in making the step four determination. (Pl.'s Br. at 9). As discussed above, the undersigned finds this argument lacks merit. While Plaintiff attempts to confuse the ALJ's explanation at step four, there is no evidence that the ALJ failed to consider the physical and mental demands of the past occupation along with Plaintiff's residual functional capacity, which includes a number of limitations beyond the mere light exertional level, when finding that Plaintiff could not perform her past relevant work. Moreover, the ALJ's decisions at the first four steps contain "adequate rationale and findings" that are supported by the medical evidence of record and explained by the ALJ's detailed analysis throughout the decision.

Furthermore, any error at step four of the sequential evaluation process as alleged by Plaintiff would be harmless as the ALJ found in Plaintiff's favor and then proceeded to the fifth step of the sequential evaluation process. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was

inconsequential to the ultimate nondisability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (stating that "[t]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); Hurtado v. Astrue, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) (finding that "[t]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) (explaining that "[w]hile the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached."). Here, the ALJ found in Plaintiff's favor by determining she could not perform her past relevant work. By doing so, this allowed the ALJ to proceed to the fifth step of the evaluation process, which placed the burden on the Commissioner to prove that Plaintiff could adjust to other work in the national economy. See McLamore v.Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

At step five, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform given her RFC, age, education and work experience. (R. 28). During the fifth step of the sequential analysis, the ALJ must pose hypotheticals to the vocational expert that "fairly set out all of [the] claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); see also Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (hypotheticals must "adequately" describe the claimant's impairments). Here, the ALJ did just that. In support of her step five finding, the ALJ explained that she "asked the vocational

expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity," which contained "limitations that eroded the unskilled light occupational base." (R. 28). The ALJ then stated that "[t]he vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as sorter…a garment inspector…and a cleaner." (R. 28). Accordingly, the ALJ adopted the vocational expert's assessment and found that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 29). The undersigned finds that substantial evidence supports the ALJ's finding at step five of the sequential evaluation process. The ALJ properly relied on the testimony of the vocational expert in response to the third hypothetical that Plaintiff could work as a sorter, a garment inspector and a cleaner. Therefore, substantial evidence supports the ALJ's decision at five of the sequential evaluation process and there is no error.

### 2. The ALJ's Credibility Analysis

The remaining issues raised by the Plaintiff concern whether the ALJ correctly considered Plaintiff's credibility. The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of her subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of

an individual's subjective symptoms, including allegations of pain, which include:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and,

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33

(N.D. W.Va. February 3, 2010) (Seibert, Mag.) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

Plaintiff argues that the ALJ erred by finding Plaintiff's allegations of her symptoms to be not credible "to the extent they are inconsistent with the above *residual functional capacity assessment*" rather than being inconsistent with the evidence as whole, as required by the rules. (Pl.'s Br. at 10-11; Pl.'s Reply at 3). Plaintiff explains that this error in boilerplate language "gives the impression that the ALJ first determined Plaintiff's RFC and then determined her credibility, which is impermissible." (<u>Id.</u>). Further, Plaintiff argues that the ALJ then failed to explain how Plaintiff's allegations were inconsistent with the evidence. (Pl.'s Br. at 11). Plaintiff also asserts that the ALJ improperly weighed factors in determining Plaintiff's credibility. (<u>Id.</u>). Specifically, Plaintiff alleges that the ALJ improperly focused on Plaintiff's unsuccessful work attempts and her limited care of her twelve-year-old stepdaughter. (<u>Id.</u>). In addition, Plaintiff asserts that the ALJ gave "great weight" to the opinions of Dr. Roman but ignored his expert opinion that Plaintiff was considered credible based on the medical records. (<u>Id.</u>). Plaintiff argues that the ALJ failed to comply with the requirements of SSR 96-7p by not considering the duration, frequency and intensity of Plaintiff's symptoms, precipitating and aggravating factors, medications and side effects, and treatment other than medication, or the opinion evidence from medical experts in the file; thus, the ALJ credibility analysis is deficient and constitutes reversible error. (<u>Id.</u>).

Defendant argues that substantial evidence supports the ALJ's credibility finding. (Def.'s Br. at 10). Defendant asserts that the ALJ thoroughly reviewed the medical evidence and Plaintiff's testimony when finding that Plaintiff's allegations were not credible to the extent they

were inconsistent with the residual functional capacity. (Def.'s Br. at 11). Defendant explains that the ALJ discussed not only Plaintiff's work attempts and care-taking of her stepdaughter, but also noted Plaintiff's daily activities, medical treatment, her performance of household chores and that her self-reported activities of daily living were inconsistent with an individual who alleged an inability to perform work within the established RFC. (Id. at 12). Defendant further argues that the ALJ did not err in not adopting Dr. Roman's opinion that Plaintiff was considered credible because according to Social Security regulations, "the ALJ is not bound by any findings made by state agency medical or psychological consultants." (Id.) (citing 20 C.F.R. § 404.1527(e)(2)(i)). Moreover, the ALJ did consider and evaluate Dr. Roman's opinion as well as other opinion evidence from the medical experts in the record. (Def.'s Br. at 12).

In making the credibility determination, the ALJ stated: "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 25). The ALJ then discussed medical evidence of record, including Plaintiff's chronic fatigue syndrome diagnosis; her July 2010 hospitalization for syncope and collapse; the July 2010 x-rays of her thoracic and cervical spine showing arthritic changes and degenerative disc disease; an MRI scan of her cervical spine revealing stenosis and degenerative changes; and her left leg neuropathy diagnosis in August 2010. (R. 25-26).

As for mental impairments, the ALJ discussed Plaintiff being admitted to St. Joseph's Hospital in 1997 for major depression and an anxiety disorder; having a GAF score of forty (40)

at this time; receiving mental health treatment at Worthington Center; reporting good response to treatment in 2008; February 2009 diagnoses of depressive disorder, not elsewhere classified (NEC) and panic disorder without agoraphobia; receiving diagnoses of depressive disorder and anxiety in July 2010; diagnoses of anxiety and depressive disorder in May 2012; and generally, Plaintiff's treatment for her anxiety and depressed by her primary care provider, Dr. Auvil. (R. 26). The ALJ then discussed the August 29, 2011 consultative examination report by Amy Guthrie, M.A., which diagnosed Plaintiff with panic disorder with agoraphobia and depressive disorder. (Id.).

After discussing this objective medical evidence, the ALJ then assessed specific instances where the evidence of record demonstrates inconsistencies in claimant's allegations. (R. 26). The ALJ points to Plaintiff's allegations regarding her inability to work based on her work attempts at her brother's business after her alleged on-set date. (Id.). Additionally, the ALJ noted that "the record indicates that the claimant is able to perform household chores and that she provides some care for a child in the home." (Id.). The ALJ explains that despite this "the claimant alleged that she became unable to work due to physical symptoms of pain as well as mental health symptoms of depression and anxiety." (Id.). In support of his credibility determination, the ALJ also found that:

> the claimant has received essentially routine and/or generally medical treatment that has been essentially effective in controlling her alleged symptoms. Moreover, the record contains no evidence of any side effects that would impact the claimant's ability to perform the jobs indicated by the vocational expert.
>
> The claimant's activities of daily living are not as limited as one would expect given her alleged symptoms and limitations. As mentioned earlier, the record reflects that the claimant has worked since the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has

generally reported.

(R. 26-27). Next, the ALJ discussed the medical opinion of Dr. Rafael Gomez, who found Plaintiff was limited to light exertional work with a number of limitations, as well as the opinion of Dr. Frank Roman, who completed mental assessment forms and found Plaintiff was at most moderately limited in some areas of mental functioning. (R. 27).

Following this lengthy analysis, the ALJ then concluded that "the above residual functional capacity assessment is supported by the claimant's testimony and written statements in connection with the clinical facts, medical findings, and opinions of treating, examining and non-examining physicians." (R. 27).

### a. Failure to Properly Consider Factors

As explained above, the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2. The undersigned finds that the ALJ's residual functional capacity assessment and credibility determination as outlined above is "sufficiently specific to make clear" the ALJ's reasoning in finding Plaintiff was not fully credible. Moreover, the undersigned finds that substantial evidence supports the ALJ's credibility determination and the ALJ complied with the requirements of SSR 96-7p and Agency regulations.

As outlined above, the ALJ provided a detailed credibility determination that provided sufficient reasons for her ultimate decision. Despite Plaintiff's assertions that the ALJ failed to consider the factors outlined in SSR 96-7p, the undersigned finds that the ALJ sufficiently

discussed the SSR 96-7p factors and provided sufficient reasons to support her credibility determination.

The ALJ discussed Plaintiff's daily activities (factor one), which included performing household chores and caring for a child in the home and found that "claimant's activities of daily living are not as limited as one would expect given her alleged symptoms and limitations." (R. 26). The ALJ discussed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) in a lengthy paragraph where she noted Plaintiff's testimony that she was unable to work "due to significant symptoms of pain in her neck that radiates into her left arm and leg as well as occasional symptoms of low back pain." (R. 25). In this same paragraph, the ALJ continues to discuss Plaintiff's pain and other symptoms:

> She takes medications and rests on pillows in attempts to relieve her symptoms of pain...she has difficult sleeping and that she experiences significant symptoms of fatigue as well as mental health symptoms of depression and anxiety. She testified that she worries over simple, everyday things and that she is occasionally fearful of being public places, especially crowded and/or loud environments. The claimant testified that she attempted to work after her alleged disability onset date, but that she was unable to maintain her job tasks due to symptoms of pain, fatigue and difficulty dealing with the public.

(Id.). In this same paragraph, the ALJ also discussed factor six, "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms" by mentioning Plaintiff's need to take medications and rest on pillows to relieve her pain. (Id.).

As for the fourth factor, the ALJ noted, "the record contains no evidence of any side effects that would impact the claimant's ability to perform the jobs indicated by the vocational expert." (R. 26). The ALJ then discussed at length Plaintiff's treatment for her conditions (factor five), including her hospitalizations and treatment by her primary care doctor, Dr. Auvil. (R. 25-26). The ALJ further noted, "the claimant has received essentially routine and/or general medical

42

treatment that has been essentially effective in controlling her alleged symptoms." (Id.).

In addition to these factors, the ALJ also noted specific inconsistencies regarding claimant's allegations regarding her inability to work. (Id.). The ALJ explained that Plaintiff worked for her brother's business after her alleged onset date and "although the claimant alleged that she became unable to work due to physical symptoms of pain as well as mental health symptoms of depression and anxiety, she also testified that she stopped working as a photo cutter when the business shut down." (Id.). While Plaintiff alleges the ALJ unfairly "focused" on Plaintiff's unsuccessful work attempt, the description of the ALJ's full credibility determination above demonstrates that Plaintiff's work was just one of many factors considered by the ALJ. Additionally, despite Plaintiff's assertion, the ALJ did not err in not adopting Dr. Roman's opinion that Plaintiff was considered credible. According to Social Security regulations, "the ALJ is not bound by any findings made by state agency medical or psychological consultants." 20 C.F.R. § 404.1527(e)(2)(i). As such, the ALJ properly considered and evaluated Dr. Roman's opinion as well as opinion evidence from the other medical experts in the record.

Based on a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is "sufficiently specific to make clear" the ALJ's reasoning in finding Plaintiff was not fully credible. Accordingly, the undersigned finds that substantial evidence supports the ALJ's credibility determination and the ALJ complied with the requirements of SSR 96-7p.

### b. Use of Boilerplate Language

The ALJ's use of the boilerplate language finding Plaintiff's allegations of her symptoms to be not credible "to the extent they are inconsistent with the above *residual functional capacity*

*assessment*" does not make the ALJ's credibility determination invalid. Plaintiff points to the Seventh Circuit's *Bjornson* case, which found the ALJ's credibility determination to be deficient because "[s]uch boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (citing Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004)). However, the Fourth Circuit recently declined to apply *Bjornson* when similar boilerplate language was used because "the ALJ cited specific contradictory testimony and evidence in analyzing [the claimant's] credibility and averred that the entire record had been reviewed." Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 68 (4th Cir. 2014) (unpublished opinion) (upholding the ALJ's credibility determination despite the use of boilerplate language).

Here, the undersigned finds that the reasoning of the Fourth Circuit's *Bishop* case more aptly applies to the present case. As outlined above, the ALJ cited specific inconsistencies between Plaintiff's allegations and the evidence of record. (R. 24-27). The ALJ also stated that the "entire record" had been reviewed and noted that "[t]he record as a whole establishes that she retains the capacity to perform work activities with the limitations set forth above." (R. 24, 27). More importantly, the ALJ's credibility analysis includes a detailed review of the medical evidence, Plaintiff's testimony and medical expert opinions. (R. 24-27). This analysis demonstrates that the ALJ in fact considered Plaintiff's credibility in light of the entire record, not the residual functional capacity. Accordingly, there is no error in the ALJ's use of the boilerplate language and the use of this language does not render the ALJ's credibility determination improper.

# VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 12th day of January, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE